UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

WILLIAM HITTLE, *et al.*,

        Plaintiffs,

                                       Case No. 2:13-cv-353
                                       JUDGE SMITH
      v.                                  Magistrate Judge Abel

RESIDENTIAL FUNDING CORP., *et al.*,

        Defendants.

**OPINION AND ORDER**

This matter is before the Court on Defendant's, The Bank of New York Mellon Trust Company's, motion to dismiss (Doc. 13) and Defendant's, Ocwen Loan Servicing's, motion for summary judgment (Doc. 17).  For the reasons that follow, BNY Mellon's motion to dismiss (Doc. 13) and Ocwen's motion for summary judgment (Doc. 17) are **GRANTED**.

## I.    BACKGROUND AND INTRODUCTION

In 2003, Plaintiffs, William and Sue Hittle, financed residential property in South Zanesville, Ohio. (Doc. 7, Amend. Compl. at ¶ 20).  On February 16, 2013, Ocwen informed them that it was now servicing their account. *Id.* at ¶ 23; (*see also* Doc. 7, Ex. C, Ocwen-Hittles Ltr. 2/16/13).  That same correspondence read in pertinent part:

Please send all written requests to:

        Ocwen Loan Servicing, LLC
        Attention: Customer Care
        3451 Hammond Ave.
        Waterloo, IA 50704-0780

(Doc. 7, Ex. C, Ocwen-Hittles Ltr. 2/16/13 at 2).  Subsequently, on February 18, 2013, Ocwen

sent the Hittles a Mortgage Account Statement which provided a different address for Qualified

Written Requests:

> **Qualified Written Request –** Under the Real Estate Settlement Procedures Act, a
> qualified written request is a written correspondence, other than notice on your
> payment coupon or other payment medium supplied by us, regarding the servicing
> of your loan which includes your name, account number, and your reasons for the
> request.  Any qualified written request you wish to submit must be sent to Ocwen
> Loan Servicing, LLC, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-
> 1330

(Doc. 17, Ex. A, sub-Ex. 3, Acct. Stmnt. 2/18/13 at 2).

On March 5, the Hittles sent a Qualified Written Request (QWR) to Ocwen at 1661

Worthington Road, Suite 100, West Palm Beach, FL 33409. (Doc. 7, Amend. Compl. at ¶¶ 24-

25; Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13).  It was received by someone named Earl Hill on

March 9, 2013. (Doc. 7, Ex. E, Cert. Mail Receipt).  It is not reflected in the record whether this

is a valid address for any office of Ocwen nor how the Hittles selected this address.  However, it

is undisputed that the right Ocwen department got the request at some point because, on April 25

and May 1, 2013, Ocwen responded and acknowledged having received the QWR as of April 18.

(Doc. 7, Amend. Compl. at ¶¶ 29-30; Doc. 7, Ex. F, Ocwen-Hittles Ltr. 4/25/13; Doc. 7, Ex. H,

Ocwen-Doucet Ltr. 5/1/13).  The Hittles allege that Ocwen's responses were tardy and

insufficient. (Doc. 7, Amend. Compl. *in passim*).

According to the amended complaint, BNY Mellon is a trust company and holder of the

Hittles' note and mortgage. *Id.* at ¶¶ 8, 10.  It is not the servicer of the Hittles' loan.  However,

the Hittles seek to hold BNY Mellon liable for the tardy and incomplete responses of the

servicer, Ocwen, on the theory that Ocwen was and is the agent of BNY Mellon. *Id.* at ¶ 11.

Though this Opinion concerns both motions for summary judgment and dismissal, the

record is very similar for both.  That is, the Hittles attached nearly all the evidence that is in the

record to the amended complaint. (Doc. 7, Exs. A-H).  The only significant evidence (and it is only significant to the motion for summary judgment) in the record that was not attached to the amended complaint is as follows: a letter from Ocwen to the Hittles, a number of discovery responses from the Hittles, and an affidavit by William Hittle. (Doc. 17, Ex. A, sub-Ex. 3, Acct. Stmnt. 2/18/13; Doc. 25, Exs. A-B, Disc. Resp.; Doc. 26, Ex. A, Hittle Aff.).

## II.    STANDARDS

Though this case turns on issues of law, because of its posture, this opinion uses two standards of review – that used to evaluate motions to dismiss and that used in summary judgments.  When judging the issues raised by BNY Mellon, the motion to dismiss standard shall be used.  When evaluating the issues raised by Ocwen, the Court uses the motion for summary judgment standard.  The Court will briefly set forth both here.

### 1.    Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of actions that fail to state a claim upon which relief can be granted.  Thus, a Rule 12(b)(6) motion to dismiss is directed solely to the complaint and any exhibits attached to it. *Roth Steel Prods. v. Sharon Steel Corp.*, 705 F.2d 134, 155 (6th Cir. 1983); Fed. R. Civ. P. 10(c).

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  To meet this standard, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009) (clarifying and broadly applying the plausibility standard articulated in *Twombly*).

Several considerations guide whether a complaint meets the facial-plausibility standard. On one hand, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Further, the factual allegations of a pleading "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. On the other hand, a complaint will not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). When making this determination, a court must construe the claim at issue in the light most favorable to the non-moving party, accept all factual allegations as true, and make reasonable inferences in favor of the non-moving party. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citations omitted).

## 2.     Summary Judgment

The standard governing summary judgment is set forth in Rule 56(a) of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

4

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any reasonable inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *See, e.g.*, *Crawford v. Metro. Gov't*, 555 U.S. 271, 274 n.1 (2009) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 195, n.2 (2004)); *Muncie Power Prods., Inc.*, 328 F.3d at 873 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989).  That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III.    DISCUSSION

The amended complaint alleges two claims.  One claim is for alleged violations of the Truth in Lending Act (TILA). (Doc. 7, Amend. Compl. at ¶¶ 44-46).  The other is for alleged violations of the Real Estate Settlement Procedures Act (RESPA). *Id.* at ¶¶ 33-43.

### A.    TILA

The provision of TILA under which the Hittles brought suit, 15 U.S.C. § 1639g, was not effective at the relevant times.  That is, the law that is now codified at § 1639g was created in Title XIV of the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. Law No. 111-203, § 1464; 124 Stat. 1376, 2184-85 (2010). The effective date for Title XIV is determined as follows:

(2)     Effective date established by rule.-- Except as provided in paragraph (3), a section, or provision thereof, of this title shall take effect on the date on which the final regulations implementing such section, or provision, take effect.

(3)     Effective date.-- A section of this title for which regulations have not been issued on the date that is 18 months after the designated transfer date shall take effect on such date.

Dodd-Frank, Pub. Law No. 111-203, § 1400(c); 124 Stat. 1376, 2136.  As regulations have been promulgated, the effective date of this section is determined by the effective date of those regulations, or, in this case, January 10, 2014. *See* Mortgage Servicing Rules Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 10,902, 11,007 (effective Jan. 10, 2014) (relevant portions now codified, with amendments, at 12 C.F.R. § 1026.36(c)(3)).  As the relevant events in this case took place in 2013, 15 U.S.C. § 1639g cannot validly form the basis of a cause of action in this case.

BNY Mellon argues this point in its motion to dismiss. (Doc. 13, D. Mot. to Dis. at 6-8). Ocwen also argues it in their motion for summary judgment. (Doc. 17, D. Mot. for SMJ at 6-8). The Hittles admit the correctness of Defendants' position in their responses. (Doc. 16, P. Re. in Opp. to Diss. at 9; Doc. 20, P. Re. in Opp. to SMJ at 6).  Thus, the TILA claims shall be dismissed.

**B.     RESPA**

In enacting RESPA

Congress's intent was "to insure that consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country."

*Vega v. First Fed. Sav. & Loan Ass'n of Detroit*, 622 F.2d 918, 923 (6th Cir. 1980) (quoting 12 U.S.C. § 2601(a)). "Although the 'settlement process' targeted by the statute was originally limited to the negotiation and execution of mortgage contracts, the scope of the statute's

provisions was expanded in 1990 to encompass loan servicing." *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012) (citations omitted).   As a remedial statute, RESPA is construed broadly to effectuate its purposes. *Carter v. Welles-Bowen Realty, Inc.*, 553 F.3d 979, 985-86, n.5 (6th Cir. 2009); *see also Medrano*, 704 F.3d at 665-66 (citations omitted) (internal quotation marks omitted) ("RESPA's provisions relating to loan servicing procedures should be construed liberally to serve the statute's remedial purpose.").

The relevant portions of RESPA are more susceptible to analysis when considered as three parts.  First, RESPA provides certain requirements that a consumer's correspondence must meet to constitute a QWR:

> (B) Qualified written request.  For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--
>
> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
>
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B) (2006).  Second, RESPA provides that, upon receipt of a QWR, the servicer is to confirm receipt:

> (1) Notice of receipt of inquiry.
>
> (A) In general.   If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days[1] (excluding legal public holidays,

---

[1] As discussed above in the context of TILA, Dodd-Frank made changes to lending laws (including to RESPA). Among such changes, Dodd-Frank reduced this acknowledgment period to 5 days. Dodd-Frank, Pub. Law No. 111-203, § 1463; 124 Stat. 1376, 2184.   As the QWR in this case was sent in March of 2013 and Dodd-Frank was enacted in July of 2010, one might think that Ocwen should have had 5, rather than 20, days in which to acknowledge receipt of the QWR.  However, § 1400(c) of Dodd-Frank delayed the effective date of Title XIV of the Act and with it, this 20-day to 5-day change. Dodd-Frank, Pub. Law No. 111-203, § 1400(c); 124 Stat. 1376, 2136;

> Saturdays, and Sundays) unless the action requested is taken within such period.

12 U.S.C. § 2605(e)(1)(A) (2006). Third, having received a QWR, the law places an obligation upon the servicer to substantively respond:

> (2) Action with respect to inquiry. Not later than 60 days[2] (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--
>
> (A) make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);
>
> (B) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
>
> > (i) to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and
> >
> > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or
>
> (C) after conducting an investigation, provide the borrower with a written explanation or clarification that includes--
>
> > (i) information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and
> >
> > (ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.

12 U.S.C. § 2605(e)(2) (2006).

---

see also 12 C.F.R. §§ 1024.35(d), 1024.36(c). Thus, the appropriate period for acknowledgment was, at the relevant time, 20 days.

[2] Dodd-Frank reduced this response period to 30 days. Dodd-Frank, Pub. Law No. 111-203, § 1463; 124 Stat. 1376, 2184. However, as above, § 1400(c) of Dodd-Frank delayed the effective date of Title XIV of the Act and with it, this 60-day to 30-day change. Dodd-Frank, Pub. Law No. 111-203, § 1400(c); 124 Stat. 1376, 2136; see also 12 C.F.R. §§ 1024.35(e)(3), 1024.36(d)(2). Thus, the appropriate period for response was, at the relevant time, 60 days.

1.      **Ocwen's Compliance with RESPA**

The Hittles allege that Ocwen violated its responsibilities in handling their QWR. (Doc. 7, Amend. Compl. *in passim*).  That is, Ocwen failed to timely acknowledge receipt, it failed to timely respond, and it failed, when it responded, to respond in appropriate substance. *Id.*; *see also* (Doc. 26, P. Supp. Re. in Opp. to SMJ at 4-11).  Ocwen retorts that the Hittles sent an overbroad QWR to the wrong address and thus the obligation to respond was never triggered. (Doc. 17, D. Mot. for SMJ at 3-6).[3]  Ocwen also argues that, even if it had an obligation to respond, the response was timely and sufficient. (Doc. 25. D. Supp. to Mot. for SMJ at 4-10).

a.      **Whether the Hittles' Correspondence was a QWR**

For a communication from borrower to servicer to count as a QWR for purposes of § 2605, it must be written and not be a mere notice on a payment medium supplied by the servicer. 12 U.S.C. § 2605(e)(1)(B).  In this case, the correspondence was a letter which denominated itself a QWR. (Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13 at 1).  It must enable the servicer to identify the name and account of the borrower. 12 U.S.C. § 2605(e)(1)(B)(i).  This did. (Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13 at 1 (stating the name, address, and loan number of William and Sue Hittle)).  It must also state reasons, to the extent applicable, that the borrower believes the account to be in error or sufficiently detail any other information sought. 12 U.S.C. § 2605(e)(1)(B)(ii).  Whether the purported QWR appropriately stated reasons why the Hittles believed the account to be in error, shall be addressed later in this Opinion.  However, a QWR may state "reasons for the belief . . . that the account is in error <u>or</u> provide[] sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B)(ii) (emphasis added).  In this case, the purported QWR sufficiently detailed eight types of

---

[3] Because Ocwen includes a motion page before its memorandum in support and then restarts the page numbers in the memorandum in support, pages 3-6 are actually pages 4-7 of the entire document.  Citations to this source throughout this Opinion shall cite to the page numbers as they appear in the memorandum.

information sought by numbered paragraphs. (Doc. 7, Ex. D, Doucet-Owen Ltr. 3/5/13 at 1-2). Thus, having satisfied one of the disjunctive options, there is no reasonable dispute that the Hittles sent Ocwen a valid QWR.

> **b.** **Whether a Response to the QWR was Necessary**

Courts (including at least one district court in the Sixth Circuit) have held that "the response obligation under RESPA is only triggered when the QWR is sent to the designated address." *Jestes v. Saxon Mortg. Servs.*, 2:11-cv-59, 2014 U.S. Dist. LEXIS 63715, *14-17 (M.D. Tenn. May 8, 2014) (collecting cases). That is, at the time when the events in this case took place, regulations allowed a servicer to designate an address at which to receive QWRs and QWRs not sent to and received at that address did not trigger a duty on the part of the servicer to respond. *See* 24 C.F.R. § 3500.21(e)(1)[4]; 12 C.F.R. § 1024.21(e)(1)[5].[6]

In this case, on February 16, 2013, Ocwen informed the Hittles that it had taken-over servicing their account and explained that all written requests should be sent as follows:

> Please send all written requests to:
>
> > Ocwen Loan Servicing, LLC
> > Attention: Customer Care
> > 3451 Hammond Ave.
> > Waterloo, IA 50704-0780

---

[4] Text of 24 C.F.R. § 3500.21(e)(1) is available in older editions of the Code of Federal Regulations and electronically in the Federal Register. *See, e.g.*, Real Estate Settlement Procedures Act; Streamlining Final Rule, 61 Fed. Reg. 13,232, 13,250 (effective April 25, 1996).

[5] Text of 12 C.F.R. § 1024.21(e)(1) is available in older editions of the Code of Federal Regulations and electronically in the Federal Register. *See e.g.*, Real Estate Settlement Procedures Act (Regulation X), 76 Fed. Reg. 78,978, 78,997 (interim effective date Dec. 30, 2011).

[6] 24 C.F.R. § 3500.21 was removed, effective July 16, 2014, as a result of Dodd-Frank and transfer of authority to interpret RESPA from HUD to the Consumer Financial Protection Bureau (CFPB). *See* Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34,224 (effective July 16, 2014). 12 C.F.R. § 1024.21 was removed, effective January 10, 2014. Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10,696, 10,702, 10,711, 10,718 (final rule effective Jan. 10, 2014) (deleting § 1024.21). Currently, differently-worded but somewhat similar provisions are codified under authority of the CFPB at 12 C.F.R. §§ 1024.35(c), 1024.36(b).

(Doc. 7, Ex. C, Ocwen-Hittles Ltr. 2/16/13 at 2).  Subsequently, on February 18, 2013, Ocwen

sent the Hittles a Mortgage Account Statement which provided an address specifically for

Qualified Written Requests:

> **Qualified Written Request –** Under the Real Estate Settlement Procedures Act, a
> qualified written request is a written correspondence, other than notice on your
> payment coupon or other payment medium supplied by us, regarding the servicing
> of your loan which includes your name, account number, and your reasons for the
> request.  Any qualified written request you wish to submit must be sent to Ocwen
> Loan Servicing, LLC, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-
> 1330

(Doc. 17, Ex. A, sub-Ex. 3, Acct. Stmnt. 2/18/13 at 2).

Such closely-spaced correspondence setting forth two different addresses for written

requests is confusing.  Moreover, the designation of a QWR-receiving address was, under the

regulations relevant at the time, to be included in the Notice of Transfer or "separately

delivered." 24 C.F.R. § 3500.21(e)(1); *see also* 12 C.F.R. § 1024.21(e)(1).  The February 18

address was not included in a Notice of Transfer nor was it "separately delivered." *Id.*  It was

simply a paragraph within a much larger mortgage statement document. (Doc. 17, Ex. A, sub-Ex.

3, Acct. Stmnt. 2/18/13 at 2).  Moreover, while the February 16 address was included in a Notice

of Transfer, it did not "establish a separate and exclusive office and address for the receipt and

handling of <u>qualified written requests</u>;" rather, it established an exclusive address for the receipt

of <u>all</u> written requests. (Doc. 7, Ex. C, Ocwen-Hittles Ltr. 2/16/13 at 2); 24 C.F.R. §

3500.21(e)(1) & 12 C.F.R. § 1024.21(e)(1) (emphasis added).

In short, it may have been true, at the relevant time and under normal circumstances, that

a servicer need not have responded to a QWR that was not sent to the designated QWR-receiving

address. *Jestes*, 2014 U.S. Dist. LEXIS 63715, *14-17 (collecting cases).  However, Ocwen did

not clearly designate an exclusive address at which it would receive QWRs.  Instead it set forth

two apparently contradictory addresses in correspondence dated two days apart.  Moreover, its

own records say, "We are working on your request received on 04/18/13.  Upon completion of

our review, a response will be sent." (Doc. 7, Ex. F, Ocwen-Hittles Ltr. 4/25/13).  In other words,

the Hittles may not have sent the QWR to the proper address, but Ocwen was not clear about

what the proper address was and the QWR eventually reached the right place because Ocwen, by

its own admission, "received [it] on 04/18/13." *Id.*  Thus, Ocwen did have a duty to respond and

hence the Court must consider whether the response was timely and adequate.

> ### c.      Timing of Acknowledgement

Following receipt of the Hittles' QWR, under the laws applicable at the time, Ocwen had

20 days to acknowledge the request. 12 U.S.C. § 2605(e)(1)(A).  The Hittles sent their QWR on

March 5, 2013 and Ocwen's acknowledgement is dated April 25, 2013. (Doc. 7, Ex. D, Doucet-

Ocwen Ltr. 3/5/13;  Doc. 7, Ex. F, Ocwen-Hittles Ltr. 4/25/13).  At first blush, this appears to be

a violation of § 2605(e)(1)(A).  However, as mentioned above, at the relevant time, regulations

and court decisions allowed a servicer to designate an addresses at which it would receive

QWRs. *See, e.g.*, *Jestes*, 2014 U.S. Dist. LEXIS 63715, *14-17 (collecting cases).

Confusing though Ocwen's attempt to designate was, Ocwen gave the Hittles two

addresses at which it would receive written requests:  Ocwen Loan Servicing, LLC, Attention:

Customer Care, 3451 Hammond Ave., Waterloo, IA 50704-0780 and Ocwen Loan Servicing,

LLC, Attn: Customer Care, PO Box 1330, Waterloo, IA 50704-1330. (Doc. 7, Ex. C, Ocwen-

Hittles Ltr. 2/16/13 at 2; Doc. 17, Ex. A, sub-Ex. 3, Acct. Stmnt. 2/18/13 at 2).  Because this

attempted designation was confusing and not strictly in compliance with the relevant regulations,

had the Hittles used either of these addresses (or, frankly, any address which, from the evidence

in the summary judgment record, could be tied to Ocwen), and had Ocwen responded then on the

schedule that it did, the Court would have no difficulty finding a violation.

However, the undisputed record reflects that the Hittles sent their QWR to 1661 Worthington Road, Suite 100, West Palm Beach, FL 33409 where it was received, on March 9, by someone named Earl Hill. (Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13; Doc. 7, Ex. E, Cert. Mail Receipt).  The record does not reflect who Earl Hill is or whether West Palm Beach, Florida is the site of any Ocwen facilities and it would not be appropriate for the Court to do independent fact research to create its own evidentiary record.  True, Ocwen ultimately received the QWR (it acknowledged receipt via letter dated April 25) but this is not proof that it was sent to a correct address. (Doc. 7, Ex. F, Ocwen-Hittles Ltr. 4/25/13).  After all, Ocwen's acknowledgment states that Ocwen received the QWR on April 18 – over a month after it was sent. *Id.*  Whether Ocwen's office in Waterloo, Iowa received the letter on April 18 because Ocwen has an office in West Palm and Mr. Hill is an employee who passed the letter through interoffice mail, or whether Ocwen received the letter because Mr. Hill is a kindly old pensioner who forwarded the misaddressed letter, is not in the record.  What is in the record, and thus what is not genuinely disputed, is that Ocwen received the letter at its QWR facility on April 18. (Doc. 7, Ex. F, Ocwen-Hittles Ltr. 4/25/13).  Accordingly, acknowledging the same in a letter on April 25, is, upon this record, within the 20-day period provided. *Id.*

> **d.      Timing of Substantive Response**

Following receipt of the Hittles' QWR, Ocwen had 60 days (excluding holidays, Saturdays, and Sundays) to respond to the merits of the request. 12 U.S.C. § 2605(e)(2).  The undisputed record shows that Ocwen received the Hittles' QWR at its QWR facility on April 18, 2013. (Doc. 7, Ex. F, Ocwen-Hittles Ltr. 4/25/13).  The QWR response, which is dated May 1, was therefore timely. (Doc. 7, Ex. H, Ocwen-Doucet Ltr. 5/1/13).

But even if the Court were to assume that Ocwen validly received the QWR when it was delivered on March 9 to Earl Hill at 1661 Worthington Road, the substantive response would still

be timely. (Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13; Doc. 7, Ex. E, Cert. Mail Receipt).  That

is, Ocwen responded substantively in a letter dated May 1, 2013. (Doc. 7, Ex. H, Ocwen-Doucet

Ltr. 5/1/13).  It is not reflected in the summary judgment record when this correspondence was

received, however the Hittles allege that it was received on May 7, 2013. (Doc. 7, Amend.

Compl. at ¶ 30).  May 1 and May 7, 2013, followed March 9 (excluding Saturdays and Sundays)

by 38 and 41 days, respectively.  Ocwen's response was within 60 days of the QWR and thus,

timely.

### e.    Sufficiency of Response

12 U.S.C. § 2605(e)(2) provides three ways in which a servicer can validly respond to a

QWR.  A servicer can make corrections to the account. 12 U.S.C. § 2605(e)(2)(A).  A servicer,

following an investigation, can explain or clarify why the account is already correct. 12 U.S.C. §

2605(e)(2)(B).  Or a servicer can, after an investigation, provide the borrower with a written

explanation or clarification that includes information requested and explain why information not

provided cannot be obtained or provided by the servicer. 12 U.S.C. § 2605(e)(2)(C).[7]

The disjunctive phrasing of 12 U.S.C. § 2605(e)(2) means that there are three ways in

which a servicer can validly respond to a QWR and a servicer need not satisfy all three. 12

U.S.C. § 2605(e)(2).  However, this Court has previously decided that a servicer does not have

unfettered discretion about which of the three options to choose:

> [C]ommon sense suggests, and the statute implies (by using language like "if
> applicable," "to the extent applicable," and qualifiers like "appropriate,") that,
> depending on the circumstances, one response method may be preferable above
> others. *See* 12 U.S.C. § 2605(e)(2). . . . .  It would, for instance, hardly be broad
> or liberal construction (as is required for remedial statutes like RESPA) to say that
> a servicer, presented with a truthful allegation that an account was incorrect, could
> respond by providing information confirming the error (thereby plausibly meeting
> 12 U.S.C. § 2605(e)(2)(C)) but doing nothing about it. *See Carter*, 553 F.3d at

---

[7] Note that this analysis may be somewhat altered in future cases by the regulations promulgated by the CFPB. *See, e.g.*, 12 C.F.R. §§ 1024.35, 1024.36.

985-86, n.5; *Medrano*, 704 F.3d at 665-66 (discussing the need to construe RESPA broadly and liberally).  Nor would it make sense to allow a servicer to choose to explain a sham or unreasonable belief that the account is correct (thereby plausibly meeting the letter of 12 U.S.C. § 2605(e)(2)(B)) rather than correcting the account pursuant to 12 U.S.C. § 2605(e)(2)(A).  Following a QWR, a company is to choose at least one of the disjunctive response options in 12 U.S.C. § 2605(e)(2) but common sense, plain language, and liberal construction dictate that it must choose the appropriate option under the circumstances.

*Marais v. Chase Home Fin., LLC*, No.: 2:11-cv-314, 2014 U.S. Dist. LEXIS 76123, *20-21 (S.D. Ohio, June 4, 2014) (Smith, J.) (footnote omitted).  In other words, "the servicer must, whatever response it chooses to make, fairly meet the substance of the QWR." *Id.* at *30.  Thus, although Ocwen was entitled to appropriately respond to the QWR by a number of methods, it is important to examine what response would have been the most "appropriate option under the circumstances" in order to "fairly meet the substance of the QWR." *Id.* at *21, 30.

In this case, while the QWR quite adequately described eight categories of information sought, it did not coherently set forth the reasons that the Hittles believed their account to be in error. (Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13 at 1-2).  In this regard the purported QWR merely stated:

> Our clients dispute all late fees, charges, inspection fees, property appraisal fees, forced placed insurance charges, legal fees, and corporate advances charged to this account.  Furthermore, our clients believe their account is in error for the following reasons: the balance due is erroneous due to excessive fees and interest.

*Id.* at 1.  Essentially, the Hittles "dispute[d] all . . . charges." *Id.*  Taken at face value, this sounds like the Hittles dispute their obligation to be charged for even the principal that they borrowed – to say nothing of interest and any legitimate fees.

Moreover, even assuming that the Hittles only meant to dispute all fees and charges other than principal payments and interest (a generous reading considering the Hittles also alleged that their interest rate was "excessive"), this dispute is still problematic. *Id.*  That is, the Hittles admit to having borrowed money pursuant to the terms of a note that they signed. (Doc. 25, Ex. A,

Disc. Resp. at 3 (admissions 1 and 3); Doc. 25, Ex. B, Disc. Resp. at 3 (admissions 1 and 3)). And they also admit that they did not make all payments on time nor were they current on their payments at the time the QWR was sent. (Doc. 25, Ex. A, Disc. Resp. at 3-4 (admissions 4 through 5); Doc. 25, Ex. B, Disc. Resp. at 3-4 (admissions 4 through 5)). Thus, at least some late fees or other charges would have been proper and hence, the Hittles could not, in good faith, have disputed "all late fees [and] charges . . . ." (Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13 at 1). Given that the disputes (or some part thereof) could not have been raised in good faith, it stands to reason that there also could not have been coherent good faith "reasons for the belief . . . that the account [was] in error" as to all charges and fees. 12 U.S.C. § 2605(e)(1)(B). Indeed, the Hittles' purported statement of reasons justifying their broad dispute amounts to a tautology, "the balance due is erroneous due to excessive fees and interest." *Id.*

The Hittles did not explain what was wrong with the account or why. They cite *Catalan v. GMAC Mortgage Corporation*, for the proposition that no magic words are required to constitute a QWR. 629 F.3d 676, 687 (7th Cir, 2011); (Doc. 26, P. Supp. Re. in Opp. to SMJ at 2). But, while no magic words are required, common sense dictates that there needs to be at least enough detail to enable the servicer to make an investigation of the alleged errors and formulate an intelligible response. Indeed, in *Catalan*, the borrower, among numerous other communications, sent a "three-page letter describ[ing] in great detail the difficulties the [borrower] encountered at the hands of RBC." 629 F.3d at 687. By contrast, the Hittles, by blanket statement, disputed everything (even things which could not, in good faith be disputed) and provided no non-circular reasons for the dispute. The Hittles did cogently request information and thus, Ocwen was obligated to make some response to the QWR. However, Ocwen could fairly meet the substance of the QWR without being compelled to guess what the

16

Hittles believed were the errors in the account or to dream-up and refute hypothetical reasons for the Hittles' vague discontent.

> i.     Ocwen's Compliance with 12 U.S.C. § 2605(e)(2)(A) – Correcting the Account

It is undisputed that Ocwen did not correct the account.  Indeed, Ocwen argues that it could not have done because it had no notion of what errors were even asserted by the Hittles. (Doc. 25, Ocwen Supp. Memo. at 6-7).  In the Hittles' response to Ocwen's supplemental brief, the Hittles point-out numerous fees that they allege are "unexplained" or "strange." (Doc. 26, D. Supp. Re. in Opp. at 7).  These criticisms may be well-founded.  The records produced show a large number of late fees, speed draft fees, as well as other adjustments. (Doc. 26, Ex. A, sub-Ex. 4, Payment Rec. *in passim*).

But the question here is whether Ocwen appropriately responded to the QWR that the Hittles actually sent, not what Ocwen should have done if the Hittles' QWR had made a good-faith attempt to give notice of even minimally specific errors.  That is, rather than responsibly allege errors based on the fees they properly believed to be erroneous, the Hittles "dispute[d] all . . . charges" and gave essentially no reason at all for their broad allegations of error. (Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13 at 1).  That the Hittles would "dispute all . . . charges" even including "all late fees" is even less decipherable as legitimate when one considers that the Hittles admit to having made delinquent payments and not being current on their debt at the time they sent the QWR. (Doc. 25, Ex. A, Disc. Resp. at 3-4 (admissions 4 through 5); Doc. 25, Ex. B, Disc. Resp. at 3-4 (admissions 4 through 5)).  Under the circumstances, confronting a generic, all-encompassing, and clearly (at least partially) false error allegation, Ocwen was under no duty to respond to the QWR by correcting the account.

ii.    **Ocwen's Compliance with 12 U.S.C. § 2605(e)(2)(B) – Explaining why the Account is Correct**

It is also undisputed that Ocwen did not explain why the account is correct. (Doc. 7, Ex. H, Ocwen-Doucet Ltr. 5/1/13).  Ocwen's letter, in fact, does not even plainly assert that the account is correct. *Id.*  However, as discussed above, because the Hittles gave no coherent reasons for believing that their account was incorrect or even identifying what about the account was incorrect,  Ocwen had no obligation, in fairly meeting the substance of the QWR, to explain to the Hittles why the account was correct. (*See* Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13 at 1).

Neither this, nor the preceding section of this Opinion should be understood to impose a heightened standard or specificity requirement on QWR error allegations.  But common sense dictates, and this Opinion recognizes, that in order for a servicer to cogently investigate and respond to allegations, the allegations must be at least specific enough to be coherent and intelligible.  The Hittles' dispute of "all late fees, charges, inspection fees, property appraisal fees, forced placed insurance charges, legal fees, and corporate advances charged to this account . . . [because] . . . the balance due is erroneous due to excessive fees and interest" is so broad as to be incoherent. *Id.*  The Hittles may as well have said that they dispute everything because everything is excessive.  Section 2605(e)(2)(B) imposes a duty on Ocwen to investigate alleged errors – not invent or imagine errors on behalf of a complaining mortgagor and investigate those.  Though it was not effective at the time the events in this case took place, 12 C.F.R. § 1024.35(g)(1)(ii), promulgated by the CFPB, supports this reasoning:

(g) Requirements not applicable.

(1) In general.  A servicer is not required to comply with the requirements . . . of this section if the servicer reasonably determines that any of the following apply:

. . . .

> (ii) Overbroad notice of error.  The notice of error is overbroad.  A notice of error is overbroad if the servicer cannot reasonably determine from the notice of error the specific error that the borrower asserts has occurred on a borrower's account.  . . . .

12 C.F.R. § 1024.35(g).  The Hittles' notice was so broad Ocwen could not have conducted any reasonable investigation or mustered any coherent response other than to say, as Ocwen, in fact, did, that the notice was too broad and invite a further dialogue. (Doc. 7, Ex. H, Ocwen-Doucet Ltr. 5/1/13 at 1-2).

### iii.    Ocwen's Compliance with 12 U.S.C. § 2605(e)(2)(C) – Providing Requested Information

However, in addition to their generic allegation that they disputed every charge associated with their loan (to which Ocwen need not have substantively responded), the Hittles' QWR requested eight categories of information:

1. The name, address, and telephone number of the owner of the note, plus the name of the master servicer of the note.
2. The date that the current note holder acquired this mortgage note, and from whom it was acquired.
3. The date your firm began servicing the loan.
4. A complete payment history of how payments and charges were applied, including the amounts applied to principal, interest, escrow, and other charges.
5. The current interest rate on this loan and an accounting of any adjustments.
6. A statement of the amount necessary to reinstate this loan.
7. A complete copy of the loan closing documents, including a copy of the note and mortgage.
8. A copy of all appraisals. property inspections, and risk assessments completed for this account.

Doc. 7, Ex. D, Doucet-Ocwen Ltr. 3/5/13 at 1-2).  Ocwen fairly met the substance of these requests and explained why it could offer no more than it did:

> In your correspondence, you request detailed information and documentation regarding nearly every aspect of the mortgage loan transaction, beginning with its origination.

. . . .

Because your letter appears to be a form letter questioning nearly every aspect of your loan transaction, it is difficult for Ocwen Loan Servicing to identify any specific concern(s) you have regarding the servicing of the account. Nevertheless, in an effort to be responsive to your request, copies of the following pertinent documentation Ocwen Loan Servicing has in its records are enclosed:

- Note
- Mortgage/Deed of Trust
- HUD-1 Settlement Statement
- 2011 Loan Modification Agreement

The following responses are in order of your inquiry:

1. The entity that currently holds the note and is the assignee of the mortgage is The Bank of New York Mellon Trust Company, National Association fka The Bank of New York Trust Company, N.A. as successor to JPMorgan Chase Bank N.A., as Trustee for RAMP 2003-RS10. The Bank Of New York Mellon, Attn: CT MBS Group 525 William Penn Place 7th Floor, Pittsburgh, PA 15259, phone number 888-999-0615. The Master Servicer of your loan is Residential Funding Corporation. However, Ocwen Loan Servicing is the current servicer and all inquiries should be directed to Ocwen Loan Servicing c/o its attorney, David A. Wallace of Carpenter Lipps & Leland LLP at 280 Plaza, Suite 1300, 280 North High Street, Columbus, Ohio 43215. This response also responds to your inquiry under the Truth in Lending Act.

2. The loan originated on September 16, 2003 with MILA, Inc., A Washington Corporation. It was later transferred to Residential Funding Corporation who transferred your loan to The Bank of New York Mellon Trust Company's predecessor trustee JP Morgan Chase Bank, As Trustee for RAMP 2003-RS10 at or around the time the RAMP 2003-RS10 trust was created in November of 2003.

3. Ocwen Loan Servicing began servicing your loan on February 16, 2013.

4. Please see enclosed payment history.

5. The current interest rate is 6.625%. Please see enclosed Note and Loan Modification Agreement.

6. The account is past due for the December l, 2012 through April 1, 2013 payments including late charges and fees totaling $6,368.40, which is the amount needed to reinstate the loan. Please see enclosed Mortgage Account Statement. A reinstatement quote and a payoff statement are also enclosed.

7. Please see enclosed Mortgage and Note. Although the loan origination file does not appear to relate to the servicing of your loan, Ocwen will produce those portions of the loan origination file readily available in Ocwen's loan servicing system under separate cover.

20

> 8.  The Broker Price Opinions (BPO) completed within the last 12 months are enclosed and a copy of the last three property inspection reports are enclosed.

(Doc. 7, Ex. H, Ocwen-Doucet Ltr. 5/1/13 at 1-2).

In the *Marais* decision, this Court held liable a servicer whose response to a QWR consisted of an utterly generic form letter and attached loan documents. 2014 U.S. Dist. LEXIS 76123, *25-31. The reasoning in *Marais* was that the lender's response evidenced no investigation of the concerns raised by the borrower's QWR and did nothing to clarify or explain the concerns raised in the QWR. *Id.* In this case, however, Ocwen's response shows that someone at Ocwen investigated the Hittles' requests, provided responsive information, and clearly explained its response to each numbered paragraph. (Doc. 7, Ex. H, Ocwen-Doucet Ltr. 5/1/13 at 1-2). This complies with the investigation and explanation requirements of 12 U.S.C. § 2605(e)(2)(C). In addition, Ocwen's response explains why it could not cogently respond further – that the QWR was so incredibly broad that there was no way to determine what error was being alleged. *See* 12 U.S.C. § 2605(e)(2)(C)(i). This constitutes a clear, good-faith, and successful effort to meet the substance of the Hittles' QWR and entitles Ocwen to summary judgment.

This Court has taken a dim view of generic form responses by servicers to QWRs in light of the statute-imposed obligations to investigate, explain, and clarify (or, if appropriate, correct the account) in response to concerns raised by a borrower. *Marais*, 2014 U.S. Dist. LEXIS 76123, *in passim*. Now this Court elucidates the previously-unwritten corollary: A borrower cannot hold a servicer liable for failing to completely respond to every possible interpretation of a generic and vague QWR when the servicer has responded with a good faith investigation and

explanation.[8]  RESPA exists to prevent abuse of borrowers by servicers – not to enable abuse of servicers by borrowers.

### 2.    BNY Mellon's Liability under RESPA

The Court has found that Ocwen did not violate RESPA.  Thus, even assuming that it might be proper to hold BNY Mellon vicariously responsible for the acts of Ocwen, BNY Mellon cannot be liable.  The Court expressly declines to address whether the holder of a note may be held vicariously liable for the misdeeds of the loan's servicer under RESPA.

## IV.    CONCLUSION

BNY Mellon's motion to dismiss (Doc. 13) and Ocwen's motion for summary judgment (Doc. 17) are **GRANTED**.

The Clerk is directed to **REMOVE** documents 13 and 17 from the Court's pending motions list.

The Clerk is directed to **REMOVE** this case from the Court's pending cases list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[8] As discussed above, 12 C.F.R. § 1024.35(g)(1)(ii), though not effective at the times relevant to this case, confirms the logic of this proposition. 12 C.F.R. § 1024.35(g)(1)(ii) ("A servicer is not required to comply with the requirement . . . of this section if . . . [t]he notice of error is overbroad.  A notice of error is overbroad if the servicer cannot reasonably determine from the notice of error the specific error that the borrower asserts has occurred on a borrower's account.").